Can it please the Court, Counsel, Kendra Matthews with Ransom Blackmon on behalf of Defendant Oscar Macias-Ovalle. In this case, the government used wiretaps as the principal investigative technique, at least after the first wiretap was issued. They skewed the normal means of investigation after that point and recycled the same information over and over again, and they did so at a speed that left no opportunity for them to engage in traditional investigation. They obtained a wiretap. They had determined or they had concluded that earlier suspects had become suspicious, and they inferred, and I'm saying this is what I read from the record and give you a chance to respond, and they had inferred that if these other folks who were lower on the food chain were suspicious, then your client who was suspected to be higher on the food chain would be even more likely to be a wary. So they eschewed those techniques which essentially hadn't worked or had the consequence of alerting the suspect for something that wouldn't. So why doesn't that make sense? Well, Your Honor, as to the initial people being investigated during the six months' investigation, there was no communication or contact or ever demonstrated any connection between those individuals and their manner of conducting their business and my client. There was no phone calls or any information connecting them. But as to suspicion, there was information that Franco held up. There were four telephone taps, Franco, Oseguera, Oseguera's associates, Ramirez and Macias Avalli. Yes. Ramirez was a supplier to Franco, right? One of many suppliers. Ramirez was a supplier to Ramirez, right? One of many suppliers. And the claim is that Macias Avalli was a supplier to Ramirez. One of them, yes. So there was a connection there. There was a connection there, but in terms of the investigation as to the investigation that had gone on so far, there was no basis for a connection that the factual way that those people conducted their business. Let me ask you this. What specific means of investigation, traditional investigation, not wiretap, did the authorities fail to employ which, had they employed, would have made the wiretap unnecessary? Well, Your Honor, they had the opportunity to conduct physical surveillance of the ---- By using a pole and a camera. A pole, camera, but they could have also ---- In a rural area where that might be noticed. Your Honor, they could have also used actual surveillance, and in fact, after they ---- In automobiles, right? In automobiles. Driving back and forth in a rural area, would that be unusual? It may, Your Honor. If I could point out that they conducted physical surveillance after obtaining the wiretap eight times at the location that they stated before they issued the wiretap. They could not do so because it was a rural area. That belies the assertion that it was a difficult or impossible thing to do. In fact, they were able to do that sort of information. They were able to identify vehicles that could be relevant. And at the speed at which they obtained the wiretaps, to come back to the point of what they could have done, what traditional means, they got a wiretap after 22 days. At that point, there was not an opportunity to obtain a confidential informant to access this group or use other means of phone, telephone taps or toll records to identify people who might be compromised and agree to cooperate and gain further information about these groups. They focused on Franco, who was one of the customers of this drug trafficking operation, but there were others. And Franco's practices didn't inform how this other, Ramirez, to look at the middle wiretap, how Ramirez might have conducted business. And then as to Ramirez, the Court spoke of the suspicion that they had. There were two attempts at surveillance, and on one of those attempts, they were not successful. So Ramirez was overheard stating, I didn't like that person that was following us. There was also substantial evidence that they were concerned about being robbed and other concerns. It wasn't that they necessarily assumed it was law enforcement, and that didn't necessarily suggest they should shut down surveillance as a traditional mean of investigation. So you said they should have done physical surveillance and should have gotten a I think that's correct, Your Honor. They don't have to – the government points out that they don't have to use every means of a traditional investigation before obtaining a wiretap. But they do have to do a reasonable, good-faith investigation and use those traditional means to respect the congressional intent that wiretaps are supposed to be issued with restraint and that each wiretap should have a demonstration of necessity that is specific to that wiretap. And the way that it was employed in this case, it was once we've established the necessity of a wiretap for the first investigation, for trap and trace wiretap number one, we can – the seal has been broken, and every time we identify a new supplier or a new drug trafficking operation and this operation has its own function and its own practices, we can just get a wiretap for that because that is the most efficient way. Well – Can I just go back to the undercover agent? I'm just looking through my notes on the application for the tap seven, where it says that they did have a special agent, I think his name was Buhanda, who was attempting to get information about Tijuana, which I guess is the AKA for your client. And indicated why he was not able to get information through that means. So is it your position that that was insufficient, that there was more that they should have done with an undercover agent? Yes, Your Honor. And my recollection of Buhanda might not be as reliable as yours is looking at it right now, but my recollection was that these were assertions that these are a close-knit group of people and that getting – infiltrating as to a trusted source and getting from Franco to Tijuana was an impossibility. But the government never looked at – So they had a special agent in that group and he asked some questions. He said, I have a big buy that I want to make or I have a customer, and he wasn't offered any information and didn't see any potential. Why isn't that sufficient? What more should the government have done? Your Honor, my recollection of him is he went to the person who sold him drugs, Franco, and made that suggestion. And Franco then said, great, give me notice and I'll let you know. And my suggestion is that going up the vertical chain that way was going to be very difficult to skip individuals, but that coming at it from a different source, compromising people who might be higher up in the chain, compromising people who worked for the defendant might have given them an opportunity to get an inside source or an inside track that – but they never engaged – and I can't identify who those people are because they never engaged in physical surveillance because they said that it was a rural area and they couldn't do so, which I think is belied. Had they done so, they might have identified people or engaged in traffic stops of people leaving that scene. What is belied, that it wasn't a rural area? It was a rural area that they said that was the reason they couldn't conduct physical surveillance. But then after they obtained the wiretap, they conducted physical surveillance of that site on no less than eight occasions, which they could have done before obtaining the wiretap. And in so doing, seeing people who left the scene – came back and forth to the scene, perhaps were people who were employed directly by a defendant and executed a traffic stop and perhaps compromised them or identified – spoken with them, identified a way to get in there. And none of those efforts were employed. It's always possible when you have the benefit of hindsight to go back and reverse engineer something and say things could have been done differently and better. It's always easier to sort of go back and – but, you know, looking forward, you know, if you get – if you know you have limitations on your physical surveillance because it's a rural area and the agents are likely to be detected, you might think, well, you know, we can use some of that when we really need it, but we have to be parsimonious about sending agents in the field because they're going to be detected. So why is it reasonable to say, you know, we have this problem, get a wiretap, and then as we develop more information from the wiretap, we can send agents in the field on a limited basis to then help develop that information? If you exhaust all of your on-the-street resources before you get the wiretap, then, you know, you're not in a position where you get information on the wiretap. You can't act on it because you've already burned your resources. Isn't that the way it works? Your Honor, may I? Sure. Yeah. I would say there's two responses to that. First is the evidence here was that on an occasion in a large several-month investigation, someone said, boy, I didn't like that guy who came into the store, you know, I'm suspicious of that person. That is not exhausting the opportunity of physical surveillance. Yes, if compromised, that would compromise the investigation, but that alone was not a sufficient basis to say, boy, we better not do anything or we might go and get more agents. It might mean let's take it easy. You know, there's suspicion around, so let's be really careful about sending more agents in. Let's try something else, and then, you know, if we really need to send somebody in, we'll send them in, but not, you know, why is that a reasonable thing to do? Well, I think, Your Honor, it turns the obligation to exercise wiretaps with restraint and as not a last resort, but one in which you really explore as to each procedure. It doesn't have to be a last resort, as you've conceded. I mean, the government doesn't have to try everything else until it gets a wiretap. I thought the standard was a little more forgiving than that. It is, Your Honor, but I would suggest that after obtaining the wiretap, then the government on the first phone and gathering more information about different components of the conspiracy, this drug trafficking operation and that drug trafficking operation, the government has to then step back and say, okay, now what means of investigation can we use before we just get a wiretap on this guy and his operation, not necessarily an individual, what traditional means can we use, and then gathering more information, do that again as they move forward, as opposed to, boy, we've done this, now we've got a wiretap. Hey, with wiretaps, we can hear what everyone's saying and identify where they're going. Let's get another one. Let's get another one. And that is, excuse the congressional intent, that each one be individually demonstrating necessity. Thank you. Thank you. We'll hear from the government. May it please the Court, counsel. I'm Jane Shoemaker, and I represent the United States in this appeal. As the Court has suggested to Ms. Matthews, there's always going to be some other government to exhaust all investigative possibilities. It doesn't have to use a wiretap as a last resort. The evidence in this case is clear that this was not the initial step in the investigation. By the time the government applied for the spinoff wiretap on TT5, the investigation had been going on for over six months. In fact, it had been going on for approximately six months when they applied for the very first wiretap in this case over TT1, Mariana Franco-Maldonado's home telephone. It was towards the end of that wire that they applied for the spinoff on TT5. By that point in time, they had not only used an undercover investigator and a confidential informant to try to infiltrate this organization. For six months, the undercover agent was buying drugs from Mariana Franco-Maldonado and never was able to discover who any of her suppliers were through physical surveillance, through conversations with her, from any of the investigation that they had conducted. There was a lengthy affidavit that detailed everything that they had done in the investigation for the first six months, and all they had been able to do was discover that Mariana Franco-Maldonado was a large drug dealer. They didn't know who her suppliers were. When they got up on the wiretap for her telephone, within days they learned that the user of TT5 was the primary supplier to her, and they attempted to use other investigative techniques to identify who that supplier was. They conducted physical surveillance in conjunction with the wiretap, where they knew that Mariana Franco-Maldonado was going to be meeting with the user of TT5 to get drugs or to deliver money, and they surveilled two meetings and attempted a third one. They missed the third meeting. After the second meeting, the agents intercepted conversations where the subjects using TT5 indicated that they were aware that they had been followed, and it doesn't matter whether they knew that was law enforcement or potential robbers. The fact is they were wary of surveillance. They were wary of being followed. In addition, the agent detailed in the affidavit for TT5 other investigative techniques that had been used or considered and rejected as either being futile in this case or too dangerous to employ. They noted that when Mariana Franco-Maldonado went to meet with the user of TT5 to pick up drugs on those first two surveillances, that two different people showed up for those deliveries, and two different cars were used. And they were able to follow them back to a residence. They checked records for the registered owners of the vehicles and for the owner of the home, and they came back to different names. They ultimately identified that Angel Ramirez was one of the people who showed up, but they didn't know who the other person was. They considered using GPS on the car, but they weren't sure which car was going to be the primary car. They weren't sure whether these people actually lived at this residence or where they kept their drugs. So there were other goals of this investigation that had not been met, and they tried a number of investigative techniques. And as I indicated, for the first six months of the investigation, despite the undercover's contacts with Mariana Franco-Maldonado, they were not able to find out who was supplying the drugs in this conspiracy. Ms. Schumacher, do you agree with Ms. Kendrick, or pardon me, with Matt Matthews, that after the wiretap, the investigators did eight physical surveillances of Macias Ovalle? Yes, Your Honor. We don't disagree with that. How could you do that after the wiretap and not before the wiretap? Well, the agent noted in the affidavit for TT7 that the user of TT7, that they believed that this was Macias Ovalle, but they weren't sure of that yet. They believed that the residence that was the remote location was where he was living. They indicated that it was difficult to conduct physical surveillance there without being detected, that they had tried to get photographs of him to confirm his identity, but had not yet been able to do that. They did not say that it would be impossible, and in fact, he said in the affidavit that they wanted to continue to use physical surveillance at that location, but they I still haven't heard why it was impossible or difficult to use physical surveillance before the wiretap, but it wasn't difficult to use after the wiretap. Well, there were still risks after they obtained the wiretap that they would be detected. However, prior to getting the wiretap, they didn't want to take that risk until they had identified who he was, and once you have a wiretap, then the benefits to doing the physical surveillance become greater, and the risks go down. For one thing, if the subjects detect the surveillance, it can generate chatter on the wiretap that can be relevant information. For another thing, at that point, by then, the investigation that had been going on for approximately nine months, they knew it was getting close to the end. They wanted to be able to use the wiretaps in conjunction with physical surveillance and other techniques to identify the user of TT7 and hopefully Who didn't much care whether he saw them photographing him, if they already had the evidence from the wiretap. There was less concern of being detected at that point, and in fact, to some extent, they would have hoped that they would generate some chatter on the wire about the surveillance to help confirm that this was the person who was dealing in this drug conspiracy. And I think the agent made clear in the affidavit for TT7 that they did intend to use physical surveillance after the wiretap was obtained, and they wanted to use it in conjunction with the wiretap. As this Court has said, that it's an appropriate or legitimate objective of the investigation to try to identify the suppliers of the chain in a conspiracy, as well as the major conspirators, the major customers in this case. And that is what the government did here. The government limited its investigation to the local suppliers. TT7 was the last wiretap in this case. After the government was able to identify who he was and surveilled some meetings in conjunction with the wiretap, with him conducting drug deals, the government was ready to take the case down. That was nine months after the investigation had begun, and it required the use of the wiretaps to solve it. Thank you. Are you out of time? Would you like a minute for rebuttal? Your Honor, if the Court has any questions, I'm prepared to answer them. I didn't hear you mention any Frank spaces in your opening argument. Your Honor, our brief does cover our Franks argument. And I would add to that, although I think it's laid out pretty clearly in our brief, that our contention is that there were affidavits being submitted by other agents involved in the investigation who were stating and asserting, for instance, that GPS was extremely useful as an investigative tool and obtaining five extensions on a particular car and stating that it offers leads and different avenues of investigation. And the affidavits in this case were stating that it was of little value and of no use both at TT-5 and at TT-7. And, for instance, with TT-7, there wasn't the investigation into the DMV vehicles. And those ñ the nature of those types of conflicts were the ñ is how we assert that the misleading statements were there. It wasn't that the factual sentences were themselves inaccurate, but given the scope of investigation, they created a misleading impression. And we believe we are entitled to a hearing to explore that further with the Court. Thank you very much. Thank you. Case 122.
judges: Kozinski, Bea, Ikuta